Mr. Justice Cox,
while concurring in the conclusion of the court, said that he dissented from the reasons given therefor, and thereupon read the the following opinion :
The petitioner, Halstead, shows, that on the 17th of June,. 1882, the Treasurer issued certain drafts, in pursuance of appropriations made by Congress, in favor of John J. Pulliam,, in his own right, and another to him as executor of John N. Pulliam, payable at the Treasury in Washington, and delivered them to the petitioner as his attorney. John J. Pulliam having died, petitioner subsequently obtained from the Orphans’ Court of this District letters of administration on the estates of both the Pulliams. He also sets forth-that in a certain chancery cause he was directed by decree of this court to indorse these drafts and collect them at the-Treasury, and distribute the prpceeds in a manner set forth in the decree ; that in pursuance of the decree he indorsed the drafts and demanded payment of them of the Treasurer,, which was refused, although the Treasurer has funds in his possession for their payment; and he asks a mandamus requiring him to pay them to the petitioner.
The Treasurer answers that he is ready • to pay to anyone legally authorized to receive the money, but that the domicile of the Pulliams was in Tennessee, and there were no assets of theirs in the District of Columbia, and the Orphans’ Court had no jurisdiction to grant letters of administration on their estates, and the letters of the petitioner are void,, that even if not void, they conferred no right to assets out of the District of Columbia, and that the debts represented bv these drafts have no local situs here, but belong to the-administrator of the domicile ; that the administrator of' the domicile and the resppndent were not parties to the decree referred to in the petition, and not bound by it.
I do not deem it necessary to consider the effect of the decree above referred to, but shall confine my examination of the case to the effect of the letters of administration issued to the petitioner and the extent of the authority-conferred by them.
*393 I understand the law as to the rights of executors and administrators, with respect to property in different jurisdictions, to be as follows :
An executor or an administrator appointed at the domcile of the deceased is entitled to the personal estate situated everywhere, subject to the rights of local creditors, to be secured by local administration, but he cannot maintain a suit to recover any property outside of the jurisdiction where he receives his letters. If such a suit becomes necessary in order to possess himself of the property, he must either obtain new letters or procure another to take them out in the jurisdiction where the property is. This new administration is called an ancillary administration, and the assets received under it are to be applied to the payment of local creditors, and the residuum, if any, is to be turned over to the administrator of the domicile for distribution under the law of that place. Among the assets which a deceased may leave are debts due him. As Lord Abinger says in Att’y Gen. vs. Bonevires, 2 M. &. W., 171; Story’s Conflict of Laws, 421, et seq.:
“ As to the locality of many descriptions of effects, household and moveable goods for instance, there never could be any dispute. But to prevent conflicting jurisdictions between different ordinaries with respect to choses in action and titles to property, it was established as law, that judgment debts were assets for the purposes of jurisdiction where the judgment is recorded; leases where the land lies; specialty debts where the instrument happens to be ; simple contract debts where'the debtor resides at the time of the testator’s death; and it was also decided, that as bills of exchange and promissory notes do not alter the nature of the simple contract debts, but are merely evidences of title, the debts due on these instruments were assets where the debtor lived, and not where the instrument was found. In truth, with respect to similar contract debts, the only act of administration that could be performed by the ordinary would be to recover or receive payment of the debt, and that would be done by him within whose jurisdiction the *394 •debtor happened to be. These distinctions being well established, it seems to follow that no ordinary in England could perform any act of administration in his diocese with ■respect to debts due from persons resident abroad,” &c.
It would follow that, at common law, no executor or administrator of a person domiciled and dying in one of the States could, in virtue of the letters obtained there, recover ■a simple contract debt due to the deceased from a resident of the District of Columbia. That could only be effected by taking out letters anew here.
This was changed by an act of June'24,1812, which provided that such executors or administrators might maintain .any suit or action, and prosecute and recover any claim in the District of Columbia, in the same manner as if their letters had been granted by the proper authority in said District. But this act was repealed by being omitted from the revision of 1874, and the law stands the same as it was before the act passed.
If an administrator appointed in a State should come within this District and, without taking out new letters here, should, in fact, collect a debt due here which the debtor voluntarily pays him, “ it would seem, on general principles,” says Judge Story (Conflict of Laws, p. 424), “he wonld be liable as an executor de son tort, or person intermeddling with such assets without rightful authority derived from the local authorities under a new grant of administration here, and might be sued by creditors here.”
And suppose further, that after such payment, administration should be granted to another person here, would it be any bar to his action against the debtor, that the latter had .already paid the debt to another administrator, who had no right to demand it, in virtue of his original administration ? And suppose a contest to arise between the original and local .administrators in relation to the administration of the debt •so received as assets of the deceased, could the original retain it against the will of the local administrator? Judge ■Story puts both these questions, and evidently thinks that they should.both be answered in the negative.
*395 The Supreme Court, however, have since held, in Wilkins vs. Ellett, 9 Wall., 741, that a voluntary payment by a debtor to a domiciliary administrator of another jurisdiction is good. And this was re-affirmed in the same case again before the court at the last term.
Subject to the contingency of a claim by a local administrator, undoubtedly, a receipt to a debtor anywhere by the administrator of the domicile would be a discharge, because the domicile is the ultimate destination of all personal assets wherever situated.
The question next presents itself, in what light, as assets, is a debt from the United States to a creditor domiciled and dying in a State to be regarded ? I speak now of a general^ simple contract indebtedness, not merged in or paid by any special obligation, though it may have been appropriated for. Is it assets at the domicile of the deceased creditor, or is the District of Columbia to be considered the habitat of the debtor, so as to make it local assets there ?
This question came before the Supreme Court in the case of Vaughan et al. vs. Northup et al., 15 Pet., 1.
James Moody resided in Kentucky and died there ; Northup took out administration on his personal effects in that State, and, in virtue of his Letters, received from the Treasurer of the United States a large sum of money. The complainants, claiming to be next of kin of James Moody, filed a bill in the District of Columbia against Northup, who happened to be found here, for an account and distribution of the personal estate.
Now, if this debt of the Government stood on the same footing as the debt of a private individual living here, then, on the grounds already referred to, Northup might have been held liable to account for it here as executor de son tori. It is true that the act of 1812, then in force, converted all debts due in this District, to a non-resident decedent, into general, as distinct from local assets, but, as to Government debts, the courts held, independently of the statute, that such was their intrinsic character, in the following language : “ But it has been suggested that the present case is distinguishable *396 because the assets sought to be distributed were not collected in Kentucky, but were received as a debt due from •the Government at the Treasury Department at Washington, and, so, constituted local assets within this District. We cannot yield our assent to the correctness of this argument. T he debts due from the Government of the United States have no locality at the seat of Government. The United States, in their sovereign capacity, have no particular place of domicile, but possess, in contemplation of law, an ubiquity throughout the Union ; and the debts due by them are not to be treated like the debts of a private debtor, which constitute local assets in his own domicile. On the contrary, the administrator of a creditor of the'Government, duly appointed in the State where he was domiciled at his death, has full authority to receive payment and give a full discharge of the debt due to his intestate in any place where the Government may choose to pay it, whether at the seat of Government or at any other place where the public funds are deposited. If any other doctrine were to be recognized, the consequence would be that before the personal representative of any deceased creditor, belonging to any State in the Union, would be entitled to receive payment of any debt due by the Government, he would be compellable to take out letters of administration in this District for the due administration of such assets. Such a doctrine has never yet been sanctioned by any practice of the Government, and would be full of public as well as private inconvenience. It has not, in our judgment, any just foundation in the principles of law.”
This was decided in 1841. In 1855, in the case of U. S., use of Mackey, vs. Coxe, 18 How., 100, the case was again referred to, and part of the language .above cited was repeated with approbation.
In that case the attorney of administrators of Mackey, appointed in the Cherokee Nation, adjusted a claim of Mackey at the Treasury Department. The Department was unwilling to pay him on his power of attorney, and required him to take out letters of administration here, which he did-He received a large sum of money, and then, as attorney for *397 the administrators of the domicile, receipted to himself as local administrator. On his way home he was accidentally killed and the money lost. The next of kin sued Ooxe, one of the sureties on his bond given here. There was no question between the original and local administrators. They were substantially one and the same, i. e., the local administrator was the attorney of the others, and took out letters here for their benefit, in order to get the funds for them. There were no creditors here, and the court held, following the language in Vaughan vs. Northup, that the domiciliary administrators could receipt for the money to whoever held it here, and consequently to the local administrator, and in that way discharge his sureties.
I am not aware that the Supreme Court has ever recalled the language employed in Vaughan vs. Northup, above cited. And it seems to be fully justified by recognized general principles.
We are accustomed to speak of debts due by the United States as moneys in the Treasury. But as far as that might import designated property in a certain place, the expression is incorrect ; even a congressional appropriation fails to earmark any specific fund, or confer upon a creditor a lien or property in it. It is nothing more than a recognition of the debt, and an authority to pay it out of the general treasure of the Government. ~
Nor has the Treasury itself any locality bounded by territorial limits.
The act of August 6, 1846, ch. 90, embodied in General Revised Statutes, Sec. 359, provided that, “ the rooms provided in the Treasury building at the seat of Government for the use of the Treasurer of the United States, &c., and the fire-proof vaults and safes erected therein for the keeping of the public moneys in the possession and under the immediate control of the Treasurer, and such other apartments as are provided as places of deposit of the public money, shall be the Treasury of the United States.”
It proceeds then to direct that the mints at Carson City and Denver, and the pay office at Boise City, shall be places of *398 deposit for such public moneys as the Secretary of the Treasury may direct; that there shall be assistant treasurers at ten different cities, including Boston, New York, New Orleans, and San Fraucisco ; that the rooms assigned to them shall be appropriated for the safe keeping of the public moneys deposited with them respectively ; and it makes all public moneys paid into any depository subject to the draft of the Treasurer of the United States, drawn agreeably to appropriations made by law.
It is true that in Cooke vs. United States, 91 U. S., 389, the expression is used, “ "that the rooms provided in the Treasury building at the seat of Government for the use of the Treasurer, are by law the Treasury of the .United States.” But that had no reference to any such question as the present. The only question in the case was, whether certain Treasury notes purchased by the assistant treasurer at New York were thereby so finally paid and retired that the Secretary of the Treasury could not return them as spurious. And the court argued that the power to retire them was conferred on the Secretary; that his department is at Washington, in which all claims must be adjusted ; that the retirement of these notes involved the adjustment of a claim, and that cannot be considered as done until the notes are-forwarded to Washington and examined, and finally received or rejected. The expression above mentioned was incidentally used in this argument, but had no reference to any such question as the situs of a debt of the United States for the purposes of administration.
Territorially, then, the Treasury is co-extensive with the Union, and the Treasurer, who is authorized, by warrant of the Secretary of the Treasury, to pay a debt appropriated for by act of Congress, may pay it out of funds in New York or San Francisco, as well as out of those in his vaults in Washington. It is impossible to say, then, that an appropriation of money gives to the creditor of the United States, a right of property in any particular deposit of coin in the city of Washington, and within the territorial jurisdiction of this court. It does not advance the creditor a *399 step beyond where he was before as to any rights of property, but leaves the debt of the Government still a mere general obligation to pay a liquidated sum, which, as the-Supreme Court says, is not an obligation to pay at the city of Washington, more than at any other place, and is not therefore property having its situs at Washington. Andr consequently, a domiciliary executor or administrator of a deceased creditor of the Government is not under the necessity of administering here on a claim against the Government, nor has a local administrator, appointed here, the exclusive right to demand it of the Government, as property situated necessarily and exclusively here, and which he only could sue for if the Government were suable in our court.
If the converse of this were true certain other serious-consequences must follow. If a debt due from the United States constituted local assets here, of a deceased creditor, it must be equally true that during the lifetime of the creditor it is property within the jurisdiction and subject to the process of the court, as completely as- a stock of merchandise would be, in the hands of the Treasurer, as bailee of the owner. It would be subject to be attached as the property of non-residents, or by way of execution. It would’be a res-with respect to which non-residents could be brought into court by publication, and which could be acted upon directly by decree of the court. The custodian of the fund would be as much subject to the direct orders and decrees of the court as any private bailee. But this court, I think, has almost uniformly declined to exercise such a jurisdiction.
In 1825 one Vasse filed his bill in the Circuit Court of this District to enjoin certain parties from receiving and the Treasurer of the United States from paying to them, the amount of an award made by a board of commissioners appointed under a treaty with Spain. The real defendants were non-residents, and publication was made against them. The court said: “The first question is, has this court jurisdiction as to any of the defendants against whom it can make a final decree? The fund out of which the claims are *400 to be paid is in the Treasury of the United States ; where is that? The Treasurer resides at Washington, and the head of the Department, but is the money there ? Can the fund be said to be within the jurisdiction of the court? We think not. The officers of the United States holding the public money, as money of the United States, are not accountable to anybody but the United States, and are not ■liable at the suit of an individual, on account of having such money in their hands. The defendants, Comegys, Pettit ■and Mifflin, against whom only an effectual decree can be made, are not within the jurisdiction of the court * * * We think, therefore, that the bill ought to be dismissed.”
With some departures from this rule, expressly authorized by statute, and others which I think were inadvertent, I think this opinion has always prevailed in both the old Circuit Court and this court. Certainly, I think I can say, that, within my recollection, it has been the tradition of both courts, that the court would not assume to decree directly against the Secretary or the Treasurer, the disposition of money in the Treasury (so-called), but would simpty decree against the parties in interest properly before the court, and that the Treasury Department, while it would not admit the authority of the court directly to dispose of funds under its control, would, nevertheless, so far respect any decision of the court and any decree made by it,'as between and against the parties interested, as to apply the money in conformity with such decree.
In 1836, in the case of Ridgway vs. Hayes, while the Circuit Court refused, on the merits, to enjoin the Secretary of the Treasury from a certain disposition of a Spanish award, Judge Cranch did, indeed, say that the fund in question was placed in the Treasury as a place of deposit only, and the United States were merely trustees, and he could not see why the United States, in cases in which they were merely stakeholders, should not submit to the decisions of the courts, but in that case it was unnecessary to decide as to the authority of the court to enjoin the payment of money out of thé Treasury. This was, of course, mere obiter, and applicable to a different class of cases from the present.
*401 - In 1837 a bill was filed by Duthill’s Adm’r vs. Coursault, claiming a portion of a French award, .and praying injunctions against its payment to other parties against' the Secretary and the Treasurer. These appeared and answered, and raised the question of jurisdiction, but under protest as to this, professed themselves willing, nevertheless, to pay to the parties who shall appear entitled. The opinion of the court does not touch that question, but decides the merits only, and directs a decree to be prepared accordingly.- The decree ■did, in form, direct the Secretary and Treasurer to pay, and this is the only case in which that occurred.
In 1840, one Metz, claiming as assignee in insolvency for Milnor, filed a bill in the circuit court of this District to enjoin Milnor from receiving and the Secretary of the Treasury from paying to him the amount of a claim against the United States, for which Congress had made an appropriation. The preliminary injunction issued, sub silentio, as prayed, and in the final decree the injunction was made perpetual, but the court decreed “ that Metz be entitled to receive, from the Secretary of the Treasury, the sum of money in the said bill sought to be recovered,” and seems to have carefully abstained from decreeing that the Secretary pay the money. The case went to the Supreme Court, and the statement of the case in the opinion of that court (16 Pet., 225) is, that “Metz filed his bill (in the court below) enjoining Milnor from receiving the money, and had a perpetual injunction,” no notice being taken.of the injunction against the Secretary. This is the single instance in the history of the court, I think, of a final injunction against the Secretary, except where it was authorized by statute, and evidently no ■question .was made on the subject, because he had no. interest in raising it. But the decree went no further as against him than an injunction, and declined to give active relief.
• An act of Congress of 1849, ch. 108, passed to carry into ■effect the treaty with Mexico, as far as it related to claims of American citizens against Mexico, enacted that where-parties claimed title to the awards made by the Mexican *402 Commission, they might give notice to the Secretary of the Treasury and file their bills in the Circuit Court of this District for injunctions and relief, and “ any injunction thereupon granted by the court shall be respected by the Treasury Department.” The same provision was extended to awards on claims against Brazil, by act of July 3, 1852, 10 Stat., 11.
Quite a number of suits were instituted under authority of these acts and among them were the cases of Dey vs. Whitney and Clark vs. Clark, cited by my brother Hagner, in his opinion. But of course, these are not precedents, and furnish no authority, for the assertion of a general authority over money in the control of the Treasury Department— not subjected by express statute to the jurisdiction of this-court.
These cases ran along for a number of years and probably while some of them were pending, Lockett et al. filed a bil'lin the Circuit Court to restrain one Pemberton from receiving and Secretary Marcy from paying to him the one-half of a certain award against Great Britain, which they claimed as counsel fees. Although this kind of case had not been provided for by statutes like those above mentioned, the court and counsel both, probably failed to distinguish between them, and here again sub silentio, a preliminary injunction went against the Secretary, as well as Pemberton. But no process was served upon the Secretary and. the final decree was not against him at all. It was simply, that Pemberton pay to the complainant the money claimed. Pemberton appealed from this decree and it was reversed on the merits,, but of course no question could come before the Supreme Court in reference to the Secretary of the Treasury. See Pemberton vs. Lockett et al., 21 How., 257.
Thus, it will be seen that there is no instance of a final decree being made against the Secretary of the Treasury respecting the disposition of a fund under his control, except in the case of Duthill vs. Coursault, in which the Secretary while reserving the question of jurisdiction, yet virtually -submitted to such decision as the court might make ; and in' the cases above referred to, not arising under the Mexican ! *403 and Brazilian award, the decrees were against only the parties in interest who were present in the court, defending,, thus giving the court jurisdiction over, these persons.
In the late case of McManus vs. Standish, decided in 1881, reported in 1 Mackey, Judge Wylie, in reviewing this whole subject, declined to go further than to say that the practice-of the court has been in favor of the jurisdiction of this court where it had the parties before it to decree as to them. It was a case of claim by counsel to part of a Mexican award made under a later treaty than the former one — that of 1868. The Secretary of State who had control of the funds-was made a formal party but did not appear, nor did the-court proceed to make any decree against him, although this was not a case of indebtedness of the United States, but the-Secretary was a mere stakeholder. All parties in interest were present in court and the decree was made between, them.
. In a stilt later case, not reported, relating to one of these-same Mexican awards, although it was not money of 'the United States, where the parties were non-residents, the court expressly declined to take jurisdiction, which they might have done if the theory were correct that such moneys Were property within the local jurisdiction of the court. We must hold, then, that a mere government indebtedness-has no local situs here, simply because this is the seat of Government. What is the consequence ?
The Supreme Court says, in Wilkins vs. Ellet, supra, that “ the original administrator, therefore, with letters taken out at the place of the domicile, is invested with the title to all the personal property of the deceased, for the purpose of collecting the effects of the estate, paying the debts, and making distribution of the residue, &c. It is true, if any portion of the estate is situated in another country, he cannot recover possession by suit without taking out letters of administration from the proper tribunal in that country, as the original letters can confer upon him no extra-territorial authority. The difficulty does not lie in any defect of title to the possession, but iñ a limitation or qualification of the *404 general principles in respect to personal property by the comity of nations, founded upon the policy of the foreign country to protect its home creditors, &c.”
Ultimately, it is admitted on all hands, that the administrator of the domicile is entitled to all debts due the deceased. The only question is whether they may or must not first be administered in the jurisdiction where the debtors are and the debts are due and where they are considered local assets. But as the only ground for appointing a local or ancillary administrator is, that there are assets situated exclusively within the local jurisdiction, which could not be sued for and collected by a foreign administrator, but only by a local one, and since that cannot apply to a debt due from the United States, which is not situated exclusively within this District, and which the administrator of the domicile “ might clearly sue for anywhere, if the United States were suable generally, it follows that as betwéen the local and domiciliary administrator, the latter would be entitled to the fund.
I am confronted, however, with a long standing practice apparently in conflict with this view.
There are many instances in which our Orphans’ Court has issued letters of administration, expressly to enable parties to represent claims against the United States or against foreign governments, before boards of commissioners. It has not only been acquiesced in, but sometimes required by the Treasury Department, as in the Mackey case, supra. It has never been done, I imagine, where any question arose as to conflicting claims of non-resident administrators, but it has been done as a matter of convenience, where the domicile was unknown or distant or abroad. Now it is suggested that if the views before stated are correct, it would follow that all these administrations were void for want of jurisdiction in the court.
Although the practice of the Orphans’ Court, with the concurrence of the Treasury officers, could not authoritatively settle the question of law under discussion, it would still be matter of regret that it should be necessary to declare the *405 practice in question wholly illegal. But this does not seem to be necessary.
And this leads me to consider a qualification of the general principle I have laid down, which I think may be fairly admitted, which is, in substance, that an indebtedness by the United States may or may not be local assets here, at the election of the Government. It is the privilege of the debtor, and not of the creditor, or his representatives, to determine the question. The debt is not necessarily or conclusively such assets, so as to give to the local administrator a right to enforce its payment, but if the Government elects to make it such, it becomes assets which our Orphans’ Court can take jurisdiction over and administer.
There is no statutory restriction upon the officers of the Treasury as to the place of payment of the public debts. It is fair to hold that they are at liberty to act upon considerations of public convenience, which are paramount to mere private convenience. While it is true that the United States is not exclusively in the District of Columbia, or its debt due exclusively there, it is also true that it is as much there as in the domicile of the creditor. And what is to prevent the Government from electing to pay its debt in the District only, and from considering the seat of Government as its habitat for that purpose. Practically, it will be seen, that nothing can prevent this. The administrator of the domicile would not be recognized here. He could not institute a proceeding like the pi'esent. He could not obtain a mandamus in any State. No State court would have jurisdiction to grant it. And no court of the United States except this has. power to grant a mandamus, except when necessary to the exercise of other jurisdiction. If the Treasurer, therefore, chooses to recognize a local administrator in this District as a proper party to receive payment of a government debt, it seems to be within his power to do so.
In the case of Wilkins vs. Ellett, decided at the last term of the Supreme Court, it was held that where a debt due to a deceased person was voluntarily paid by the debtor at his own domicile in a State in which no administration had been *406 taken out and in which no creditors or next of kin resided, to an administrator appointed in another State, and the sum paid was inventoried and accounted for by him in that State, the payment was good as against an administrator afterwards appointed in the State in which the payment was made, although this was then found to be the domicile of the deceased.
There is no danger, in the light of this ruling, that the United States could ever be called on again for money voluntarily paid to a local administrator here and fully administered, where at the time there was no foreign administrator to claim, as in the cases before referred to. The payment would be considered a discharge, and, if so, the local administrator must be held to have rightfully received it, and the money to be assets in his hands. It does not, therefore, seem to me that the general views I have expressed threaten the integrity of the administration heretofore granted by the Orphans’ Court. Another qualification of the general doctrine is to be noted.
I have spoken,, so far, of a mere general indebtedness, the payment of which has been authorized by an appropriation, at the time of the creditor’s death. This, we have seen, has no local situs. But it is very easy for such a situs to be given it by arrangement with the creditor in his lifetime. If, for example, the Treasurer of the United States, when authorized by the Secretary’s warrant, to pay the debt, should give his draft upon an assistant Treasurer in New York, and the latter should accept it, it is evident that a change would take place in the character of the debt. In place of an open account, commercial paper — a bill of exchange — has been substituted. Assuming it to be the bill of the Government, it is governed by the same rules as that of an individual. United States vs. Bank of Metropolis, 15 Pet. The bill has become payable at a place certain, and the debtor is there. That is the place of the contract, and the bill would be assets there. And the same would seem to be the rule when the Treasurer gives a draft on himself. It may be said that this is a bill of exchange, accepted as soon as drawn, to be paid at his *407 counter here, just as a bill drawn by a partner on his firm is accepted in the very act of drawing it. More properly, perhaps, it is- the promissory note of the Treasurer payable here. Byles on Bills, p. 66.
The original indebtedness at large of the United States to the Pulliams has now been paid off — conditionally—by the drafts described in the proceedings. These are a written •contract of the Treasurer, whose official residence is at the seat of Government, to pay so much money at this place, and this has been accepted in place of a general indebtedness payable anywhere. The United States is under no obligation to pay these drafts anywhere else than here ; no officer of the United States is authorized to do so and the creditor has no right to demand their payment elsewhere. In virtue ■of this transaction, the cause of action is here only, and the debtor is here. It is difficult to conceive how a debt •can be more effectually localized.
The drafts have an intrinsic value as muniments of title to the money they represent. Without them the money cannot be drawn. The foreign or domiciliary administrator could not recover them from the attorney in whose possession they were. Only a local administrator could do that. Virtually, the attorney has done the only thing which he could be forced to do, viz., he has delivered them to the local administrator who, in this case, happens to be himself. This administrator is the only person who can present them for payment. As the Supreme Court says, in Wilkins vs. Ellett, supra: “ The administrator, by virtue of his appointment and authority as such, obtains the title in promissory notes or other written evidences of debt held by the intestate at the time of his death and coming to the possession •of his administrator, and may sell, transfer and indorse the same,” &c. We do not see why his endorsement and delivery of them to the Treasurer would not be a perfect protection to him.
The case then stands as if an administrator appointed here were suing a resident, debtor on his promissory note payable here, and the latter were making the defence that *408 there is an administrator at the domicile of the deceased, which would obviously be no bar to the action.
The official character of the respondent, however, makes it necessary to resort to the writ of mandamus. There are no controverted questions of fact calling for the exercise of judgment and discretion on the part of the Treasurer, but the single issue of law whether the petitioner is the person legally entitled to the money which it is the plain ministerial duty of the Treasurer to pay.